UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
AT LONDON

| | | |
|---|---|---|
| PIONEER RESOURCES | ) | |
| CORPORATION, | ) | |
| | ) | Civil Action No. 6: 04-465-DCR |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | |
| | ) | **MEMORANDUM OPINION** |
| NAMI RESOURCES COMPANY, LLC, | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is pending for consideration of the Plaintiff's motion for leave to amend the Complaint [Record No. 99] and the Defendant's motion for partial summary judgment [Record No. 87]. For the reasons discussed below, the Court will deny the Plaintiff Pioneer Resources Corporation's ("Pioneer" or "the Plaintiff") motion for leave to amend the Complaint and will grant the Defendant's motion for partial summary judgment.[1]

## I.  Background

Defendant Nami Resources Company, LLC ("NRC" or "the Defendant"), is a natural gas company that owns and operates more than 800 wells in southeastern Kentucky. In February 2002, Shigemi Morita, the principal of Pioneer, and NRC entered into four separate Participation Agreements. Under the agreements, Morita agreed to purchase a working and revenue interest in four wells that had not yet been drilled. Specifically, the Participation Agreements provided

---

[1]     Although the Court will grant the Defendant's motion for partial summary judgment, it will do so for the reasons discussed below, not necessarily for the reasons raised in the Defendant's motion.

that Morita was required to pay 50% of the "total cost" of the drilling and completion costs of the wells in exchange for a 50% working interest and 40% revenue interest in each well. Once Morita recouped his investment, the agreements provided that his working interest would be reduced to 25%.

Morita selected the following four wells for investment: (1) Barry Hembree, et al., #1 well (the "Hembree Well"), located in Knox County, Kentucky; (2) Rondall Hamilton #2 well (the "Hamilton Well"), located in Knox County, Kentucky; (3) SMEPA #43 well (the "SMEPA #43 Well"), located in Bell County, Kentucky; and (4) SMEPA #31-A well (the "SMEPA #31A Well"), located in Clay County, Kentucky. The Participation Agreements explicitly set forth the "total" drilling costs associated with each well. The agreements provided that the "total cost" for drilling the Hembree and Hamilton Wells was $308,000 and for the SMEPA #43-A and SMEPA 31-A Wells was $320,000 and $392,500, respectively.

Section 1 of the Agreement relating to the Hamilton Well is illustrative of the terms contained in each of the Participation Agreements. It provides as follows:

<u>Drilling and Completion of the Wells</u>

NRC hereby grants to Morita, subject to the terms and conditions of this Agreement, the right to participate in the drilling and completion of Rondall Hamilton #2. Morita desires to contribute 50% of total cost of drilling, through completion, in exchange for 50% working interest and 40% net revenue interest. Total cost shall be $308,000 through completion. Morita will pay 50% of the total cost of the drill (sic) and will participate as a 50% working interest owner until total payout (dollar for dollar) which interest will then be reduced to 25% working interest.

[Record No. 87, Ex.1] The aggregate total cost of drilling and completion of the four wells was $1,328,500. Therefore, Morita paid $664,250 (*i.e.*, 50% of the total cost).

-2-

This action arises from the parties' Participation Agreements.  The Plaintiff filed this action on September 21, 2004.  Through the Complaint, it alleged, in relevant part, that:

> 9.    Nami has fraudulently overstated the cost of drilling all four (4) natural gas wells thereby charging Pioneer too much money for its participation interest.

> 10.    Since the first sale of natural gas from the aforesaid four (4) natural gas wells, Nami has fraudulently, with malice, and in utter disregard of the rights of Pioneer, underpaid Pioneer in an exact amount as yet undermined, but in any event, far in excess of $75,000.00.

> 11.    Nami has fraudulently, and without right to do so, converted to its own use funds to which Pioneer is entitled.

> 12.    The fraudulent actions of Nami include, but are not necessarily limited to, the intentional overcharging of drilling and completion costs and the intentional withholding of and retention of funds due Pioneer with full knowledge the it was not entitled to such funds and with the specific intent to defraud Pioneer.

[Record No. 1, Complaint ¶¶ 9-12]  Based on these allegations, the Plaintiff seeks to recover compensatory and punitive damages as well as costs and attorney's fees.

The Defendant filed an answer and counterclaim on October 27, 2004.  [Record Nos. 5, 7]  Since that time, the parties have been involved in numerous discovery disputes and, based on those disputes, have sought extensions of various deadlines.  On April 27, 2006, the Defendant filed a motion for partial summary judgment, seeking judgment in its favor on the Plaintiff's tort claims.  On May 15, 2006, the Plaintiff filed a response in opposition to the motion and simultaneously filed a motion to amend the Complaint.  These motions are now ripe for review by the Court.

## II.      Plaintiff's Motion for Leave to Amend the Complaint

As an initial matter, the Court must address the Plaintiff's motion for leave to amend its Complaint.  Specifically, Pioneer has moved the Court to add additional claims and three additional parties.  In support, it asserts that the preliminary accounting was not completed in this case until April 25, 2006, and that the information obtained from this accounting gives rise to the additional claims.  More specifically, the Plaintiff asserts that:

> the Accounting has provided the basis for Pioneer's allegations that NRC, Nami, and Guess fraudulently induced Morita to enter into Participation Agreements and defrauded Pioneer.  Absent the Accounting, meaningful preparation of the Amended Complaint could not proceed and, in no case could the required elements of the scheme to defraud be satisfied.

[Record No. 98, p. 18]

NRC contends that the Court should deny the motion to amend because granting it at this late date will cause NRC to suffer prejudice inasmuch as it will have no time for discovery and, therefore, insufficient time to develop a defense to these additional claims.  According to NRC, Pioneer's Amended Complaint raises ten new claims, including claims under Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq*. ("RICO").

### A.      Legal Standard

Pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend a pleading shall be "freely given when justice so requires."  Fed.R.Civ.P. 15(a).  The grant or denial of a motion to amend is within the sound discretion of the Court.  *General Elec. Co. v. Sargent & Lundy*, 916 F.2d 1119, 1130 (6th Cir. 1990).  However, "when an amendment is sought at a late stage in the litigation there is an increased burden to show justification for failing to move

-4-

earlier.  *Wade v. Knoxville Utilities Board*, 259 F.3d 452, 459 (6th Cir. 2001).  The Supreme

Court has identified several factors in deciding whether to allow an amendment of a complaint.

These factors include, but are not limited to, the following: (1) whether there was undue delay

in filing the motion; (2) whether the amendment would cause undue prejudice to adverse parties;

(3) whether the movant is acting in bad faith; and (4) whether the amendment is futile.  *Foman*

*v. Davis*, 371 U.S. 178, 182 (1962); *Robinson v. Michigan Consol. Gas Co.*, 918 F.2d 579, 591

(6th Cir. 1990).  In *Wade*, the Sixth Circuit held that "[n]otice and substantial prejudice to the

opposing party are critical factors in determining whether an amendment should be granted."

*Wade*, 259 F.3d at 458-59.  Given that these factors are particularly relevant in the instant case,

the Court will focus its inquiry on the undue delay and undue prejudice factors.

### B.    Discussion

#### 1.    Undue Delay

On March 30, 2006, the Plaintiff moved the Court to amend the Scheduling Order to: (1)

complete pre-trial discovery; (2) identify expert witnesses; and (3) file dispositive motions.

[Record No. 76]  In support of the motion, Pioneer argued that the extension was necessary

because the Defendant had failed to pay and provide the accountants with necessary information

so that they could complete their work.  At that time, Pioneer indicated that the accountants had

informed counsel that a preliminary report would be issued on or about April 3, 2006.  The

Plaintiff further indicated that, after reviewing the report, it would be able to complete discovery,

identify expert witnesses, and file dispositive motions.  Pioneer stated that such extensions would

not affect the deadline for the scheduled pretrial and trial dates.  Notably, it did not give the

-5-

Court any indication that the information obtained from the accounting might necessitate an amendment of the Complaint.  To the contrary, it appears that Pioneer did not contemplate such action, given that it stated that the trial could proceed as scheduled.

In addition, at the April 10, 2006, hearing on the motion to amend the scheduling order, the Plaintiff made no mention of its discovery of additional information that would dictate amendment of the Complaint.  Instead, it assured the Court of its intention to proceed to trial on the scheduled date.

While the Court cannot ascertain when the Plaintiff learned of the information giving rise to the claims asserted in the proposed Amended Complaint, it appears that Pioneer was aware of the basis for its claims several months prior to filing the motion to amend, if not earlier. Pioneer's Complaint asserts two primary factual allegations: (1) that NRC "fraudulently underpaid" Pioneer for its share of the well revenues by under reporting gas volumes and prices; and (2) that NRC "fraudulently overcharged" it for drilling costs.  In the proposed Amended Complaint, Pioneer goes further in attempting to allege that NRC was engaged in an elaborate scheme to defraud.  Pioneer claims the Defendant induced Morita to enter into these agreements, purposefully misrepresented the drilling costs, and systematically and fraudulently understated the monthly volumes of gas produced.  Further, Pioneer claims that NRC underpaid it for its working and revenue interest as required under the contract.  Although more detailed in the proposed Amended Complaint, the factual basis giving rise to the claims sought to be asserted is the same as those factual allegations supporting the existing claims.[2]

---

[2]        For example, Pioneer attempts to allege a fraudulent inducement claim in the Amended Complaint. However, contrary to the Plaintiff's assertions, the Complaint does not appear to contain such claim.  It is

-6-

Pioneer has indicated that, until it received the accounting report, it was unaware of the "extent of Nami's and Guess' involvement in the . . . fraudulent activities." [Record No. 98, p. 18] However, regardless of whether Pioneer knew the *full extent* of their involvement, it could have asserted claims against them in the original Complaint. Nami is the person who Pioneer claims made misstatements to Morita during the negotiations concerning the wells. Certainly, Pioneer would have been aware of potential claims against Nami at the outset of this litigation. Likewise, Pioneer took Guess's deposition on August 29 and 30, 2005. Even if it was not fully aware of the claims against Guess at the outset of this litigation, it should have been able to ascertain any potential claims against her once it took her deposition, approximately eight (8) months prior to filing the motion to amend.

It is also worth mentioning that Pioneer did not file the motion to amend until after NRC filed its motion for summary judgment. In addition to adding new claims, including four RICO claims and three additional parties, the proposed Amended Complaint contains significantly more detail than the original Complaint. The timing of the motion to amend gives the Court the distinct impression that Pioneer was attempting to cure the deficiencies outlined by the Defendant through its motion for summary judgment.

In summary, the Court finds that Pioneer has failed to offer an adequate justification for its failure to pursue the claims raised in its Amended Complaint in a more timely manner. Thus,

---

apparent that fraudulent inducement claim shares the same factual basis as the claims set forth in the Complaint. Specifically, the Plaintiff contends that Morita was fraudulently induced to enter into the Participation Agreements because NRC perpetrated a fraud against him by overcharging him for the drilling costs and underpaying Pioneer for the working and revenue interests.

the Court finds that there has been undue (and intentional) delay in the filing of the motion for leave to amend.

### 2.      Undue Prejudice

Even if the Court assumes that Pioneer has not unduly delayed in the filing its motion to amend, an amendment of the Complaint to add new parties and a new significant number of new claims at this point in the proceedings will cause undue prejudice to the Defendant.  The discovery and dispositive motion deadlines have passed.  Therefore, NRC will be unable to conduct any further discovery regarding Pioneer's proposed claims.  Further, it will be unable to file motions to dismiss or motions for summary judgment.  *See e.g., Wade*, 259 F.3d at 459. Trial of this matter is scheduled to begin in less than two months.

While the Plaintiff suggests that this amendment would not delay the trial of this matter, the Court cannot agree.  Certainly, in order to defend against the addition of new claims *and* new parties, the Defendant would need to be given the opportunity to engage in additional discovery. And as noted by the Defendant, re-opening discovery will result in additional expense to the Defendant based on the continued litigation.  *See e.g., Feldman v. Allegheny Int'l, Inc.*, 850 F.2d 1217, 1225 (7th Cir. 1988) (leave to amend may be denied when it would cause delay in litigation).

Again, while the Court cannot ascertain the date upon which the Plaintiff became aware of the basis of its additional claims, it is reasonably clear that the Plaintiff had an indication for several months prior to filing the motion to amend that it would request such relief.  However, it delayed seeking to assert these claims until approximately two weeks before the close of

discovery and the dispositive motion deadline and until after a motion for summary judgment had been filed. There appears to be no justification for the delay. Further, the Court finds that the Defendant would be substantially prejudiced by allowing Pioneer to amend its Complaint at this late stage of the litigation. Therefore, the Court will deny the Plaintiff's motion for leave to amend its Complaint.

### III.    The Defendant's Motion for Partial Summary Judgment

The Defendant has moved for partial summary judgment on Pioneer's tort claims. NRC has characterized these claims as "fraudulent underpayment," "fraudulent overcharging", and conversion. It asserts that the "fraudulent underpayment" and conversion claims fail as a matter of law because they are barred by Kentucky's economic loss doctrine. In support of the motion for summary judgment concerning Pioneer's "fraudulent overcharging" claim, NRC asserts that: (1) Pioneer was not a party to the Participation Agreements; (2) even if Pioneer was the real party in interest, it was charged only the costs agreed upon by the parties; and (3) as a matter of law, the representations concerning the costs of the wells were not fraudulent misstatements.

In response, Pioneer claims that the economic loss doctrine is not applicable in this case as NRC asserts. Alternatively, it argues that even if the economic loss doctrine is applicable, it will not bar a claim of fraudulent inducement. Further, Pioneer contends that it was the real party in interest and NRC's representations concerning the costs of the wells constituted fraudulent misstatements upon which it relied.

## A.      The Legal Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A dispute over a material fact is not "genuine" unless a reasonable jury could return a verdict for the nonmoving party. That is, the determination must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986).

"Once a moving party has met its burden of production, 'its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Keeneland Ass'n, Inc. v. Earnes*, 830 F. Supp. 974, 984 (E.D. Ky. 1993) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). The nonmoving party cannot rely upon the assertions in its pleadings; rather that party must come forward with probative evidence, such as sworn affidavits to support its claims. *Celotex*, 477 U.S. at 324. In making this determination, the Court must review all the facts and the inferences drawn from those facts in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587. Ultimately, the standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided

that one party must prevail as a matter of law." *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251-52).

### B. Discussion

#### (1) The Economic Loss Doctrine

Under the economic loss doctrine, a plaintiff may only pursue tort claims which are independent from any claim for breach of contract. Tort claims cannot be maintained absent a showing of tortious conduct which is separate and independent from the alleged breach of contract. According to NRC, no separate and independent tortious conduct exists for Pioneer's alleged tort claims. In support of this argument, NRC relies primarily upon the holding in *General Elec. Co. v. Latin American Imports*, 214 F. Supp. 2d 758 (W.D. Ky. 2002). However, in that case, the court applied Florida law in dismissing the plaintiff's tort claims under the economic loss doctrine.

The economic loss rule is a judicially-created doctrine that has evolved through the years to preserve the distinctions between tort and contracts claims. *Ohio Casualty Ins. Co. v. Vermeer Manufacturing Co.*, 298 F. Supp. 2d 575, 578 (W.D. Ky. 2004). While the Supreme Court of Kentucky has never expressly adopted the economic loss rule, a number of appellate decisions have implicitly applied it in the past. *See Presnell Const. Mangers, Inc. v. EH Const., LLC*, 134 S.W.3d 575 (Ky. 2004) (Keller, J., concurring). The rule has typically been applied in products liability cases to protect manufacturers from tort liability for damage that is limited to the product itself.

Notwithstanding the paucity of state authority on this issue, a recent opinion from the Western District of Kentucky has addressed Kentucky's application of the economic loss rule. In *Davis v. Siemens Medical Solutions USA, Inc.*, 399 F. Supp. 2d 785, 801 (W.D. Ky. 2005), the defendant moved for summary judgment regarding a misrepresentation claim, arguing that, because the misrepresentation claim was inseparable from the contract claim, the economic loss rule barred the tort claims and limited the Plaintiff's remedy to breach of contract. The court held that:

> to date, no Kentucky court has held that the economic loss rule applies so expansively. Instead the economic loss rule has been limited to apply to products liability cases, *see, e.g., Ohio Casualty Ins. Co.,* 298 F. Supp. 2d at 577-78, to business purchases, *see, e.g., Mt. Lebanon Personal Care Home Inc. v. Hoover Universal Inc.,* 276 F.3d 845, 849 (6th Cir. 2002), and to construction cases, *see, e.g., Bowling Green Municipal Utilities v. Thomasson Lumber Co.,* 902 F. Supp. 134 (W.D. Ky. 1995). To expand the rule so as to bar a fraudulent inducement claim in an employment contract without further guidance from the Kentucky courts would eviscerate the claim of fraudulent inducement and would contravene contrary Kentucky case law. *See, e.g., Hanson v. American Nat'l Bank & Trust Co.,* 865 S.W.2d 302, 309 (Ky. 1993) ( "The idea that any person or industry or enterprise would be immune from liability for fraud and deceit is not acceptable.")

*Davis*, 399 F. Supp. 2d at 801.

The most recent discussion of the economic loss rule by the Kentucky Supreme Court occurred in *Presnell*. There, two justices acknowledged in a concurring opinion that the economic loss rule was originally rooted in products liability cases. Then-Justice Keller opined that the rule has "evolved into a modern, general prohibition against tort recovery for economic loss." *Presnell*, 134 S.W.2d at 583-84 (Keller, J., concurring). The Court's majority opinion, however, decided the case without any reference to the economic loss rule.

-12-

Interestingly, in the instant case, the Defendant has not discussed the concurring opinion despite the fact that Justice Keller seems to embrace the Defendant's contention that the economic loss rule should be extended to cases outside the realm of products liability, business purchases and construction cases. This Court, however, cannot conclude that the concurring opinion from *Presnell* is persuasive evidence that the Kentucky Supreme Court will expand the applicability of the economic loss rule to all types of cases. As noted by a recent decision from the Western District of Kentucky, the "concurring opinion neither considered nor analyzed the difficulties of applying the rule to circumstances beyond the sale of goods." *Louisville Gas and Electric Co. v. Continental Field Systems, Inc.*, 420 F. Supp. 2d 764 (W.D. Ky. 2005).

In *Louisville Gas*, the court concluded that the economic loss rule did not apply to the providing of a service as opposed to the selling of a product. Thus, the court held that

> [t]his Court believes that it is on sound ground in predicting that Kentucky court would apply the economic loss rule in its classic definition. However, it would be pure speculation to suggest that Kentucky courts would adopt the broader application of the rule discussed in the *Presnell* concurrence.

*Louisville Gas*, 420 F. Supp. 2d at 770.

In light of prior Kentucky decisions, this Court finds that the Kentucky Supreme Court would likely not extend the economic loss doctrine outside the products liability, business purchases or construction cases. While the Defendant urges this Court to extend the economic loss doctrine to the facts presented in this case, arguing that the rationale and purpose of the doctrine is equally applicable, the role of this Court is to apply the economic loss doctrine in the same manner as it would be applied by the Supreme Court of Kentucky. It would be pure speculation for this Court to conclude that the Kentucky courts would adopt a broader

-13-

application of the rule, given existing case authority.  Therefore, the Court concludes that the economic loss rule is not applicable in this case.

### (2)    The Plaintiff's Claims

The Plaintiff has failed to specifically articulate the claims raised in its Complaint. Therefore, prior to addressing the Defendant's motion for summary judgment, the Court must identify the claims in order to determine which, if any, should survive summary judgment.  Rule 8(f) of the Federal Rules of Civil Procedure requires the Court, when construing a complaint, to do so in a manner that will "do substantial justice."  Fed.R.Civ.P. 8(f).  Under the liberal federal pleading rules, the Court must look to the substance of the *entire* complaint to determine the claims that have been properly asserted.  In the present case, the Plaintiff's Complaint alleges, in relevant part, that:

> 9.    Nami has fraudulently overstated the cost of drilling all four (4) natural gas wells thereby charging Pioneer too much money for its participation interest.

> 10.    Since the first sale of natural gas from the aforesaid four (4) natural gas wells, Nami has fraudulently, with malice, and in utter disregard of the rights of Pioneer, underpaid Pioneer in an exact amount as yet undermined, but in any event, far in excess of $75,000.00.

> 11.    Nami has fraudulently, and without right to do so, converted to its own use funds to which Pioneer is entitled.

> 12.    The fraudulent actions of Nami include, but are not necessarily limited to, the intentional overcharging of drilling and completion costs and the intentional withholding of and retention of funds due Pioneer with full knowledge the it was not entitled to such funds and with the specific intent to defraud Pioneer.

[Record No. 1, Complaint ¶¶ 9-12]

-14-

(a)      The Alleged Fraud Claims

While the Defendant contends that the Plaintiff has alleged two fraud claims, *i.e.*, a "fraudulent underpayment" and a "fraudulent overcharging" claim, the Court notes that it has been unable to locate any cases in which the Kentucky courts have held a party liable in tort for "fraudulent underpayment" and/or "fraudulent overcharging."  However, Kentucky law does recognize a claim for fraud, *i.e.*, fraudulent misrepresentation, and fraudulent inducement. Notwithstanding this fact, the allegations in the Complaint do not support a claim under either theory.[3]

Under either theory, a plaintiff must allege that a declarant made a material misstatement of fact upon which the plaintiff relied and upon which the declarant knew (or should have known) the plaintiff would rely.  As noted by the Sixth Circuit in *In re Sallee*, 286 F.3d 878 (6th Cir. 2002),

> [t]he proper distinction between fraudulent misrepresentation and inducement derives from the context in which the fraudulent misrepresentation occurred.  If the misrepresentation occurred with the intention of inducing a party to act, the result is fraudulent inducement.  If the misrepresentation did not occur within the context of inducing another to act, but instead was a misrepresentation for other purposes, the result is another form of fraud, for example, fraud in the factum, where the document signed was itself misrepresented.

*Id.* at 905 (Batchelder, J., concurring) (internal quotations omitted).  Again, under either theory, a plaintiff must allege a material misrepresentation upon which it relied.

In paragraph 9 of the Complaint, the Plaintiff alleges that "Nami fraudulently overstated the cost of drilling all four (4) natural gas wells."  Even if the Court assumes that the fraudulent

---

[3]      Pioneer has attempted to allege a fraudulent inducement claim in the tendered Amended Complaint.

overstatement of the cost was the alleged misstatement, the Plaintiff has not alleged that Morita relied on this statement and that such reliance resulted in damages. Therefore, based on the factual statements contained in the Complaint, Pioneer can prove no set of circumstances that would establish a viable claim.[4]

Rule 8(a) provides that the plaintiff's complaint must contain "a demand for judgment for the relief the pleader seeks." If the Plaintiff were to prevail on a fraudulent inducement claim, the relief would be recision of the Participation Agreements. Pioneer has not indicated in its Complaint, pleadings, or otherwise, that it seeks to set aside the Participation Agreements. To the contrary, the Plaintiff has clearly pled a breach of contract claim. The fact that the Plaintiff has not requested rescission is a further indication that Pioneer has not plead a claim for fraudulent inducement.

### (b)    Breach of Contract

The alleged "fraudulent underpayment" claim is actually a claim for breach of contract. Under the contract, performance was required by both parities. Initially, Morita was required to perform by paying NRC 50% of the "total cost" to drill and complete the wells. Each Participation Agreement sets forth the "total cost" of drilling the well through completion. In exchange for contributing 50% of the "total cost" of the drilling and completion costs of the well,

---

[4]    Kentucky Civil Rule 9.02 requires that all allegations of fraud must be "stated with particularity." Under Kentucky law, an allegation of fraud in a pleading must set forth the time, place and substance of the allegedly fraudulent statements. To the extent the Plaintiff is attempting to plead fraud, the Court finds that the Plaintiff has not complied with Rule 9.02 by setting forth "facts with sufficient particularity to apprise defendant fairly of the charges against him." *Scott v. Farmers State Bank*, 410 S.W.2d 717 (Ky. 1966).

NRC was required to provide to Morita/Pioneer [5] a 50% working interest and 40% revenue interest until such time as he recouped his investment.   At that point, the Participation Agreements provide that Morita/Pioneer's working interest in each well would be reduced to 25%.

The Complaint alleges that "Nami has fraudulently  .  .  . underpaid Pioneer." [Record No. 1, Complaint ¶ 10]  According to Pioneer, NRC under reported the volume of gas produced by the wells and, therefore, failed to pay the amount of money it was owed.  Inasmuch as the duty to pay Morita/Pioneer for the working and revenue interests arose by virtue of the Defendant's contracts with Morita, the Court finds that this is a classic breach of contract claim.

To recover for breach of contract under Kentucky law, "a plaintiff must show the existence and the breach of a contractually imposed duty."  *See Lemming v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001).  According to Pioneer, the Defendant breached the Participation Agreements because it under reported the volume of gas produced by the wells and, therefore, failed to pay Pioneer the amount of money as set forth under the Participation Agreements.

The Court acknowledges that Pioneer has alleged that NRC acted "fraudulently."  Within every contract there is an implied covenant of good faith and fair dealing which encompasses an duty to act sincerely and without deceit or fraud.  *See Pearman v. West Point Nat'l Bank*, 887 S.W.2d 366, 368, fn. 3 (Ky. App. 1994).  However, the tort itself arises from a violation of a duty to act in good faith that is imposed by common law, not by the terms of the contract.  Not

---

[5]        The real party in interest issue does not apply with respect to this claim because Morita's working and revenue interests subsequently were conveyed to Pioneer.

all contracts impose a duty that, if breached in bad faith, may be remedied in tort.  Courts typically only find a breach of the duty to act in good faith in those contracts involving "special relationships," which are not found in ordinary commercial settings.  The most notable are contracts between insurer and insured where distinct elements are present, such as unequal bargaining power, vulnerability and trust among the parties.  *See e.g., Ennes v. H & R Block Eastern Tax Servs.*, ___ F. Supp. 2d ___, 2002 WL 226345 (W.D. Ky. 2002).  Those circumstances do not exist in this case.

Here, the record reflects that Morita was an experienced investor and solicitor of investments in natural gas wells.  [Morita Depo., p. 280]  He had invested in more than a dozen wells before his investment with NRC. [Morita Depo., pp. 111-113]  Further, Morita even served as director of a publicly-traded natural gas company (Tengasco) for a period of approximately four and one-half years.  In the past, Kentucky courts have refused to extend the tort action for breach of the covenant of good faith and fair dealing to non-insurance contracts.  The Court finds no trend in the law to abandon this limitation, nor any compelling policy reason to initiate a change of direction.  Inasmuch as contract damages are available to make the Plaintiff whole for the alleged "underpayment" of the working and revenue interests, the Plaintiff may seek redress under a breach a contract theory.  However, Pioneer may not  pursue the same claim in tort as well.

Recognizing that there are unresolved factual questions regarding Pioneer's breach of contract claim, NRC has not moved the Court for summary judgment on this issue.  At trial, Pioneer will be permitted to present evidence and testimony relating to NRC's alleged under

reporting of the volume of gas produced by each well and the alleged underpayment of the working and revenue interest as required under the terms of the contract.[6]

### (c)     Unjust Enrichment

Paragraph 9 of the Complaint provides that "Nami has fraudulently overstated the cost of drilling all four (4) natural gas wells thereby charging Pioneer too much money for its participation interest." [Record No. 1, Complaint ¶ 9]  Further, in paragraph 12, the Plaintiff alleges that:

> [t]he fraudulent actions of Nami include, but are not necessarily limited to, the intentional overcharging of drilling and completion costs and the intentional withholding of and retention of funds due Pioneer with full knowledge that it was not entitled to such funds and with the specific intent to defraud Pioneer.

[Record No. 1, Complaint ¶ 12] The Defendant contends that these paragraphs constitute a "fraudulent overcharging" claim.[7]  However, as noted above, the Court is unaware of any relevant authority that has recognized a tort cause of action for "fraudulent overcharging."  In looking at the entirety of the Complaint, the Court will construe these allegations as a claim for unjust enrichment.

Under Kentucky law, for an unjust enrichment claim to be viable, the Plaintiff must show that: (1) a benefit was conferred upon the Defendant at the Plaintiff's expense, (2) a resulting appreciation of the benefit by the Defendant, and (3) an inequitable retention of the benefit

---

[6]     However, Pioneer will not be allowed to present evidence on the issue of whether the Defendant overcharged Morita for the drilling costs of the four wells.  As discussed below, this issue relates to Morita's (or the Plaintiff's) performance under the contract.  There is no remedy for entering into a bad bargain.

[7]     In its brief, NRC raised an issue regarding whether Pioneer was a real party in interest on the "fraudulent overcharging" claim.  Inasmuch as this Court has construed the "fraudulent overcharging" claim as an unjust enrichment claim and has found that it fails as a matter of law, it need not address the real party in interest issue.

-19-

without payment for its value.  *See Tractor and Farm Supply, Inc. v. Ford New Holland, Inc.*, 898 F. Supp. 1198 (W.D. Ky. 1995).  Recovery under a claim for *quantum meruit* or a contract implied by law is distinguishable from an express or implied-in-fact contract.  In *Perkins v. Daugherty*, 722 S.W.2d 907 (Ky. App. 1987), the Kentucky Court of Appeals stated that:

> [A] contract implied by law allows for recovery quantum meruit for another's unjust enrichment.  It is not based upon a contract but a legal fiction invented to permit recovery where the law of natural justice says there should be a recovery as if promises were made.  The courts supply the fiction to permit the recovery.

*Id.* at 909.

In essence, Pioneer claims that NRC was unjustly enriched by retaining the money it overcharged Morita for the drilling and completion costs of the wells.  Pioneer acknowledges that, pursuant to the terms of the contract, Morita agreed to pay 50% of the "total cost" of the drilling and completion costs of the wells.  However, it contends that inasmuch as the "total cost" of drilling was, in fact, substantially less than the amount set forth in the contracts, NRC was unjustly enriched by the excess money.

In *Codell Construction Company v. Commonwealth*, the Kentucky Court of Appeals held that "the doctrine of unjust enrichment has no application in a situation where there is an explicit contract which has been performed."  *Codell Constr. Co. v. Commonwealth*, 566 S.W.2d 161, 165 (Ky. Ct. App. 1977).  The benefit created by Pioneer was part of the performance required in the written contracts with the Defendant.[8]  Pioneer was required to pay 50% of the "total cost"

---

[8]    The alleged conduct likewise cannot be construed as a breach of contract claim inasmuch as payment for the cost of drilling the wells was part of Pioneer's performance under the contract.  A party may not enforce a provision of a contract to which it bears the obligation or duty.  *See Clark v. West*, 193 N.Y. 349, 358-59 (N.Y. 1908).  Morita was specifically required under the contracts to pay 50% of $1,328,500.00.  Morita paid this amount.  Thus, there is no breach of contract for the Defendant's alleged overstatement and

-20-

to drill the wells in exchange for a percentage of the revenue and working stream.  The amount of "total cost" was explicitly set forth in the contract.[9]  And although the Plaintiff now contends that Nami "overstated" and "charged [it] too much money for its participation interest," there is no basis to re-work a contract that a party later determines to be a bad bargain.  The fact that Pioneer "overpaid" for the ensuing working and revenue stream does not obligate NRC to return money to which it was entitled under the express terms of the contracts.  NRC's retention of the "excess money" for the drilling costs of the wells does not rise to the level of inequitable conduct.

### (d)    Conversion

Finally, NRC alleges that Pioneer has asserted a claim for conversion.  In paragraph 11 of the Complaint, Pioneer avers that "Nami has fraudulently, and without right to do so, converted to its own use funds to which Pioneer is entitled." [Record No. 1, Complaint ¶ 11] Further, paragraph 12 the Complaint provides that "[t]he fraudulent actions of Nami include . . . the intentional withholding of and retention of funds due Pioneer with full knowledge that it was not entitled to such funds and with the specific intent to defraud Pioneer."  [Record No. 1, Complaint ¶ 12] To plead a claim for conversion, a party must allege that:  (1) it had ownership rights in a certain property; (2) that the Defendant wrongfully took or disposed of the

---

overcharging of the drilling costs.

[9]       According to the Participation Agreements, the total cost of drilling the Hembree and Hamilton Wells was $308,000.  The total drilling costs of the SMEPA #43-A and SMEPA 31-A Wells were $320,000 and $392,500, respectively.

property; and (3) that it suffered damages.  *Davis*, 399 F. Supp. 2d at 801; *Goss v. Bisset*, 411 S.W.2d 50, 53 (Ky. 1967).

To the extent Pioneer is basing its conversion claim on the Defendant's failure to return the funds that Morita was allegedly overcharged for drilling the wells, the Court will grant the motion for summary judgment, inasmuch as Defendant rightly came into possession of these funds.  Kentucky law recognizes that when a plaintiff consents to a transfer of property, he no longer has a cause of action for conversion.  *Gross v. Citizens Fidelity Bank Wnchester*, 867 S.W.2d 212, 214 (Ky. App. 1993).  In the present case, Morita and NRC agreed on an amount of money to drill the wells and included that amount in the express language of the contract. While Pioneer now contends that the "agreed total price" was not the "actual total price" and that NRC overcharged Morita to drill the wells, these allegations do not support a conversion claim. Morita and/or Pioneer agreed to pay the alleged excess amount.  Therefore, the Court finds that Pioneer has failed to state claim for conversion.

To the extent that Pioneer is alleging that NRC failed to pay the Plaintiff for the revenue and working interest of the wells, the Court must initially determine whether the Plaintiff may proceed with both a conversion and breach of contract claim.  A conversion claim and a breach contract claim are not always incompatible.  However, a  conversion claim will not exist if the property right alleged to have been converted arises entirely from the contractual rights to compensation.  *See Davis*, 399 F. Supp. 2d at 801.

In the present case, Pioneer alleges that NRC systematically adjusted the volume of natural gas produced by the wells and wrongfully deprived Pioneer of the unreported natural gas

and proceeds.  The parties' contractual relationship defined their rights regarding the unreported natural gas and proceeds.  Further, Pioneer seeks payment of the money (*i.e.*, damages) in an amount that he is due under the terms of the contracts.  Therefore, the Court finds that Pioneer cannot maintain a conversion claim to the extent that it is based on this conduct.

### (e)    Punitive Damage Claim

Under Kentucky law, punitive damages are not available for breach of contract.  *Federal Kemper Insurance Co. v. Hornback*, 711 S.W.2d 844 (Ky. 1986); *Ford Motor Co. v. Mayes*, 575 S.W.2d 480 (Ky. App. 1978).  Further, K.R.S. § 411.184(4) explicitly provides that "[i]n no case shall punitive damages be awarded for breach of contract." K.R.S. § 411.184(4).  Inasmuch as the Plaintiff's only remaining claim is a breach of contract claim, the punitive damage claim fails as a matter of law.

### IV.    Conclusion

Pioneer's proposed Amended Complaint raises a number of new claims and attempts to add new parties.  However, it has delayed pursuing these claims until after NRC filed a motion for summary judgment and only two weeks prior to the close of discovery and the dispositive motion deadline.  For the reasons discussed above, the Court believes and finds that Pioneer's actions constitute undue and unacceptable delay.  Further, the Court finds that NRC would be substantially prejudiced by allowing Pioneer to amend its Complaint at this stage of the litigation.

Through the pending motion, NRC has moved for judgment in its favor on Pioneer's tort claims.  After reviewing the pleadings, the Court has concluded that Pioneer asserted breach of

contract, unjust enrichment and conversion claims.   Additionally, Pioneer seeks punitive damages.  However, because the Court finds that NRC is entitled to judgment as a matter of law on the unjust enrichment and conversion claims, the Court will grant NRC's motion for summary judgment regarding these claims as well as the Plaintiff's request for punitive damages.

Accordingly, it is hereby **ORDERED** as follows:

1.    The Plaintiff's motion for leave to amend its Complaint [Record No. 99] is **DENIED**;

2.    The Defendant's motion for partial summary judgment [Record No. 87] is **GRANTED**;

3.    The Plaintiff's tort claim, which the Court has construed as a claim for unjust enrichment, is **DISMISSED**;

4.    The Plaintiff's conversion claim is **DISMISSED**;

5.    The Plaintiff's punitive damages claim is **DISMISSED**.

This 26th day of June, 2006.



Signed By:

*Danny C. Reeves*  DCR

**United States District Judge**